IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA
F/B/O EASTERN
WATERPROOFING &
RESTORATION CO., INC.,
   *Plaintiff*,

v.

BERKLEY REGIONAL
INSURANCE CO.,
   *Defendant*.

Civil Action No. ELH-12-02228

# MEMORANDUM OPINION

G-W Management Services, LLC ("G-W"), as prime contractor, entered into a contract ("Prime Contract") with the United States of America (the "Government") for a renovation project at the Walter Reed National Military Medical Center in Bethesda (the "Project").[1] Use Plaintiff Eastern Waterproofing & Restoration Company, Inc. ("EWR") served as a subcontractor on the Project. *See* Subcontract, Compl. Ex. 1 (ECF 1-2). In accordance with the Miller Act, 40 U.S.C. § 3131 *et seq.*, G-W secured a payment bond, identified as OMB No. 9000-0045, from Defendant Berkley Regional Insurance Company ("Berkley"). *See* Bond, Compl. Ex. 6 (ECF 1-7).

The Government subsequently cancelled a portion of the Project and G-W agreed to reduce the price of the Prime Contract. However, G-W and EWR were unable to agree upon the amount by which to reduce the price of the Subcontract. After G-W and Berkley refused to pay EWR the amount of money EWR sought, EWR filed suit under the Miller Act against Berkley

---

[1] The Project site was formerly known as the National Naval Medical Center and is sometimes referred to as Bethesda Naval Hospital.

for the amount it claimed it was owed by G-W. Complaint, ECF 1.[2] G-W is not a party to this action.

On March 21, 2013, Berkley filed a Motion for Summary Judgment ("Motion," ECF 16), supported by a Memorandum ("Memo," ECF 16-1) and exhibits. EWR filed an Opposition ("Opp.," ECF 17), and Berkley filed a Reply (ECF 19). No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I will deny the Motion.

### Factual Summary

G-W, the prime contractor, entered into Contract no. N40080-10-D0498-0009 with the Government for the Project.[3] As noted, pursuant to the Miller Act, 40 U.S.C. § 3131 *et seq.*, G-W secured a payment bond from Berkley. The bond provides protection to subcontractors who provide labor and material in connection with the Project.

EWR was a subcontractor to G-W on the Project under Subcontract 10-009-01, which was executed on February 2, 2011. EWR was initially tasked with the renovation and reconstruction of two parking garages, referred to as Building 54 and Building 55 ("Garage Renovation"). *See* Subcontract at 1. The Subcontract was a fixed price contract; G-W agreed to pay EWR $1,394,843.00 for its work. *Id.* According to EWR, G-W later issued change orders

---

[2] The Miller Act authorizes any "person that has furnished labor or material in carrying out work" under a Miller Act contract and who "has not been paid in full within 90 days after the day on which the person did or performed the last of the labor furnished or supplied the material" to bring "a civil action on the payment bond." 40 U.S.C. § 3133(b)(1). Such a civil action must be filed "in the name of the United States for the use of the person bringing the action." *Id.* § 3133(b)(3)(A).

[3] The Prime Contract is not in the record.

that increased the price of the Subcontract to $3,008,074.75. *See* Demand Letter, Compl. Ex. 5 (ECF 1-6) at 2; *but see* Reply at 5 n.3 (stating that G-W disputes that the total price of the Subcontract was $3,008,074.75).

On September 30, 2011, the Government and G-W executed a modification of the Prime Contract, which reduced the scope of the Garage Renovation by deleting portions of the planned work on Building 54 and all of the planned work on Building 55 (the "Modification Agreement"). *See* Compl. Ex. 4 (ECF 1-5) at 2. For the reductions in work on Building 54, G-W and the Government agreed to reduce the Prime Contract price by $133,429. *Id.* For the deletion of work on Building 55, G-W and the Government agreed to reduce the Prime Contract price by $1,126,325. *Id.* The Modification Agreement also established an "accelerated construction schedule" for the remaining work on Building 54, and the Government agreed to pay G-W an extra $316,810 for compliance with that schedule. In all, the Modification Agreement reduced the price of the Prime Contract by $942,944.

EWR was not involved in the negotiations between G-W and the Government regarding these price modifications, nor was it given the opportunity to consent or object to the Modification Agreement. *See* Demand Letter at 1. Nevertheless, G-W sought to adjust the Subcontract to account for the change in scope of the work.

The Subcontract contained three provisions that allowed G-W either to modify or to terminate the Subcontract if the Government changed the scope of the Project. *See* Subcontract ¶¶ 14, 15, 25. The first, titled "Extra Work," provides, *id.* ¶ 14:

The Contractor may at any time direct the Subcontractor to perform extra work or changes under this Subcontract. Only extra work authorized by the Contactor as an extra or change in writing shall be paid for by the Contractor. If the extra work direction does not originate from Owner's direction and there is no prior agreement on price, then Subcontractor shall be paid for the actual direct costs of said work plus fifteen percent . . . .

The second, titled "Owner Changes," provides, *id.* ¶ 15:

Changes ordered by the [Government] shall be performed and paid for in accordance with the terms of the Prime Contract . . . . [P]ayment for Owner changes shall not be due the Subcontractor as a specific condition precedent until the Contractor [receives payment from the Government].

The third, titled "Termination for Convenience," provides, *id.* ¶ 27:

Contractor shall have the right to terminate this Agreement for its own convenience for any reason by giving notice of termination effective upon receipt thereof by Subcontractor. . . . Settlement with the Subcontractor shall be accomplished in accordance with the provisions of the Termination for Convenience clause in the Prime Contract. If the Termination for Convenience clause in the Prime Contract is not applicable, the Subcontractor shall only be paid either the actual cost for work and labor in place, plus fifteen percent (15%), or a pro rata percentage of the Subcontract amount equal to the percentage of completion for the Subcontractor's work as approved by the Contractor, whichever is less. Subcontractor shall not be entitled to anticipated profits on unperformed portions of the work.

Prior to August 30, 2011, G-W appears to have notified EWR as to the change in scope. *See* Demand Letter at 1. However, the record does not reflect the nature of that communication or the Subcontract provision on which G-W relied to adjust the Subcontract.

In any event, G-W and EWR agreed that the Modification Agreement reduced the amount of work EWR was to perform, and thus reduced the price of the Subcontract between G-W and EWR. However, they disagreed about the manner in which that reduction should be

calculated. Although G-W's methodology is not entirely apparent from the record, it is clear that G-W issued two "Change Orders" that, in total, reduced by $975,968 the sum owed to EWR. *See* Change Order 11, Compl. Ex. 2 (ECF 1-3); Change Order 15, Compl. Ex. 3 (ECF 1-4). In EWR's view, "the proper measure of the deductive change order is the amount it 'would have cost' EWR to perform the deleted work." Demand Letter at 1 (citation omitted). According to EWR, the cost to perform the deleted work would have been $504,450.72.[4] Demand Letter at 1. Thus, EWR maintained that it was entitled to the total subcontract price of $3,008,074.75, less $504,450.72, for a total amount of $2,503,624.03. EWR provided this calculation to G-W on August 30, 2011. *See* Demand Letter at 1.

The parties agree that G-W has already paid EWR the sum of $1,993,974. EWR, believing itself to be entitled to a total payment of $2,503,624.03, demanded payment from G-W for the difference of $509,649.65. *See* Demand Letter. G-W has not paid EWR the demanded sum. Compl. ¶ 34. EWR also sent its Demand Letter to Berkley, which also refused to pay the demanded sum. Compl. ¶ 49.

On July 7, 2012, EWR, in the name of the United States, filed suit against Berkley under the Miller Act, alleging that Berkley has "breached its obligations to EWR under the Bond by failing to pay the balance due pursuant under [sic] the Subcontract." Compl. ¶ 49. The parties engaged in discovery and proceeded toward trial to resolve the question of how properly to

---

[4] It is unclear how EWR arrived at this number or what components it included in its calculation. I take no position on whether EWR's calculation is accurate, or on the legal veracity of EWR's argument that the proper measure of a deductive change order is the amount it "would have cost" the subcontractor to perform the deleted work.

calculate the reduction in the subcontract price. *See* Joint Status Report, ECF 14 (noting that neither party intended to file a dispositive pretrial motion).

On March 19, 2013, EWR sent to G-W its job cost records for the Garage Renovation. Those records reflect that EWR expended a total of $1,339,140.94 for its equipment, material, labor, subcontract, and "other" costs on the Garage Renovation. Memo Ex. B (ECF 16-3). The report was attached to an email from counsel for EWR, which explained, Opp. Ex. 1 (ECF 17-1): "Please note that this only reflects EWR's direct out-of-pocket costs. It does [sic] include G&A costs,[5] which are subject to an audited rate of 13.9%. With G&A added in, the grand total comes to $1,525,281.53."

Two days later, Berkley moved for summary judgment, claiming the Miller Act does not permit EWR to recover from Berkley any amount in excess of EWR's actual costs on the Garage Renovation, and that because EWR's costs have already been met, Berkley is entitled to summary judgment.

Additional facts will be included in the Discussion.[6]

**Standard of Review**

---

[5] G&A is a common abbreviation for "General & Administrative."

[6] On April 1, 2013, G-W filed a breach of contract action against EWR in the Circuit Court for Montgomery County, arising out of the Project. *See* Status Report, ECF 18 ¶ 3. In the state court action, G-W claims that it overpaid EWR and seeks the return of $453,962 from EWR. Reply at 5 n.3. EWR stated in its status report of April 19, 2013, that it intended to file a counterclaim against G-W in the state court action, seeking to recover the same damages that it seeks from Berkley in this litigation. Status Report, ECF 18 ¶ 3.

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. It provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); s*ee Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith, Radio Corp.*, 475 U.S. 574, 586 (1986). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). The Fourth Circuit has explained: "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a genuine issue for trial. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Liberty Lobby*, 477 U.S. at 248.

In resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. However, "[i]t is the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp.*, 477 U.S. at 323–24).

**Background**

*The Miller Act*

The Miller Act, 40 U.S.C. § 3131 *et seq.*, imposes certain obligations on the prime contractor on any "contract of more than $100,000 . . . for the construction, alteration, or repair of any public building or public work of the Federal Government." 40 U.S.C. § 3131(b). Of import here, the Miller Act requires the contractor to furnish a payment bond, through a satisfactory surety, "for the protection of all persons supplying labor and material in carrying out the work provided for in the contract." *Id.* § 3131(b)(2). In *F. D. Rich Co., Inc. v. U. S. f/u/o*

*Indus. Lumber Co., Inc.*, 417 U.S. 116, 122 (1974), the Supreme Court explained the purpose of this payment bond:

> Ordinarily, a supplier of labor or materials on a private construction project can secure a mechanic's lien against the improved property under state law. But a lien cannot attach to Government property, *see Illinois Surety Co. v. John Davis Co.*, 244 U.S. 376, 380 (1917), so suppliers on Government projects are deprived of their usual security interest. The Miller Act was intended to provide an alternative remedy to protect the rights of these suppliers.

Two lines of cases governing a subcontractor's recovery from a Miller Act surety are of import here. The first establishes that when a prime contractor breaches or terminates a subcontract, the subcontractor cannot recover expectation damages from the Miller Act surety. This result reflects the Miller Act's equivalency to a mechanic's lien: "[S]ince unrealized gain or profit for breach of contract cannot be recovered under such a lien, a subcontractor should not be allowed to recover for loss of profits on the statutory bond under the Miller Act." *Arthur N. Olive Co. v. U.S. for Use & Benefit of Marino*, 297 F.2d 70, 72 (1st Cir. 1961). To be sure, the subcontractor may "institute an independent action against the contractor for the unrealized profits stemming from the breach," but "such an action may not be maintained against the surety on the contractor's bond under the Miller Act." *Id*.

The second line of cases applies when a subcontractor fully performs its contractual obligations, but the prime contractor fails or refuses to pay the subcontractor for its work. In that situation, "the surety is obligated to pay the compensation to which the parties have agreed, although this amount exceeds the cost of labor, materials, and overhead." *U. S. for Use & Benefit of Woodington Elec. Co., Inc. v. United Pac. Ins. Co.*, 545 F.2d 1381, 1383 (4th Cir.

1976); *accord Price v. H. L. Coble Const. Co.*, 317 F.2d 312, 317 (5th Cir. 1963) ("If the plumbing contractor has to sue the surety company, the amount of his recovery is measured by the contract sum, and of course the contract sum includes the contractor's profit. If such a contractor cannot include a profit, he would not be in business.").

*Government Contract Modifications*

In order to provide the Government with flexibility in its contracting activities, most Government construction contracts provide at least two methods by which the Government can modify or delete work on a construction project. *See generally* John C. Cibinic, Jr., *et al*, *Administration of Government Contracts* (4th ed. 2006) at 1049–50, 1071 (hereinafter "*Admin. of Gov't Contracts*"). The first, a Termination For Convenience clause, gives the Government "the broad right to terminate [a contract] without cause." *Id.* at 1049. The concept of termination for convenience was developed to allow the Government rapidly to scale back its procurement efforts when major wars came to an end. *Id.* Today, termination for convenience clauses are mandatory, with limited exceptions, in fixed-price construction contracts with the Government in excess of $100,000. *Id.* at 1050. A contractor whose contract with the Government is terminated for convenience may recover from the Government "costs incurred, profit on work done, and costs of preparing the termination settlement proposal," but "[r]ecovery of anticipated profit is precluded." *Id.*

Federal regulations require a prime contractor "to terminate any affected subcontracts" when the Government terminates the prime contract. However, federal regulations do not

provide that these subcontract terminations are governed by the same terms as the prime contract termination.  8-49 *Government Contracts: Law, Admin. & Proc.* § 49.110.  Rather, the regulations provide that, "[u]pon termination of a prime contract, the prime contractor . . . [is] responsible for the prompt settlement of the settlement proposals of [its] immediate subcontractors."  48 CFR § 49.108-1.  For this reason, the Federal Acquisition Regulations advise "that prime contractors [on government projects] 'should' include a 'Termination for Convenience' clause in their subcontracts 'for their own protection . . . .'"  Steven W. Feldman & W. Noel Keyes, *Government Contracts in a Nutshell* (5th ed. 2011) at 631.  As noted, the Subcontract at issue here contains a Termination for Convenience clause.  *See* Subcontract ¶ 27.

The second method by which the Government may modify a construction contract is through a Changes clause.  These clauses, which also appear in most Government contracts, give "the government the unilateral right to order changes in contract work during the course of performance."  *Admin. of Gov't Contracts* at 379; *see* 48 C.F.R. § 52.243-4.  Among other things, a Changes clause provides the Government "operating flexibility . . . to accommodate advances in technology and changes in the government's needs and requirements."  *Admin of Gov't Contracts* at 380.  As noted, the Subcontract contains a clause allowing G-W to alter the Subcontract to reflect Government changes to the Prime Contract.  *See* Subcontract ¶ 15.

## Discussion

In its Motion, Berkley argues that EWR is barred as a matter of law from recovery against Berkley for two reasons.  First, Berkley cites the previously discussed line of cases for

the proposition that subcontractors may not recover from a Miller Act surety the anticipated profits for unperformed work. Motion at 6–8; *see U.S. f/u/b/o of T.M.S. Mech. Contractors, Inc. v. Millers Mut. Fire Ins. Co. of Texas*, 942 F.2d 946, 950–53 (5th Cir. 1991). Second, Berkley notes that the Termination for Convenience clause in the Subcontract limits EWR's recovery to "the actual cost for work and labor in place, plus fifteen percent (15%)," and it further provides that EWR "shall not be entitled to anticipated profits on unperformed portions of the work." Subcontract ¶ 27.

EWR does not appear to dispute Berkley's legal argument that a subcontractor cannot recover anticipated profits from a Miller Act surety on terminated subcontracts, nor does it dispute the content of the Termination for Convenience clause. However, EWR claims that those cases and that provision are inapplicable because the Subcontract was not terminated. Rather, it was modified and then fully performed as modified. To EWR, this "is a simple case of doing the work and recovering the full subcontract price to which the parties have agreed." Opp. at 8.

EWR's argument that it fully performed on the Subcontract, as modified, proceeds as follows: 1) under the original Subcontract, EWR agreed to perform all 25 phases for a price of $3,008,074.75; 2) the Subcontract was modified, making the project a 10 phase project; 3) to account for this change, the Subcontract price should have been reduced to $2,503,624.03, which is the difference between the Subcontract price of $3,008,074.75 and the $504,450.72 that it

"would have cost" EWR to perform the cancelled work; 4) EWR fully performed the Subcontract as modified; 5) therefore, it is entitled to full payment of the new Subcontract price.

Thus, the crux of the dispute concerns the way in which the changes made to the Subcontract are characterized in the wake of the Government's cancellation of portions of the Project. Summary judgment for Berkley is only appropriate if the undisputed facts establish 1) that the Subcontract was terminated for convenience, and 2) that EWR seeks to recover anticipated profits for unperformed work.

Berkley's claim that the Subcontract was terminated for convenience takes two forms. Berkley first argues that "EWR's subcontract with G-W was terminated in whole by the [Government's] action in deleting 60% of the total work for the Project which resulted in the complete deletion of <u>all</u> of the remaining portions of the Project." Reply at 4. Berkley then describes the rules governing the Government's use of a Termination for Convenience clause in its contracts, and then argues that, under those principles, the Government's action is best characterized as a termination for convenience. *E.g.*, Reply at 5–7. This argument focuses on the wrong contract. Regardless of the contractual mechanism the Government used to modify the *Prime Contract*, the Government's action by itself had no impact on the *Subcontract*. The Government was not a party to the Subcontract, EWR was not a party to the Prime Contract, and nothing in the Subcontract provides that the Government's actions with respect to the Prime Contract have a *per se* effect on the Subcontract. Rather, the Subcontract was affected only

when G-W communicated the change to EWR, the impact of which is governed by the terms of the Subcontract between those two parties.

Even if the characterization of the Prime Contract was relevant, it would not help Berkley's cause. The Government modified, but did not terminate, the Prime Contract. The document in which G-W and the Government agreed to the change was titled "Amendment of Solicitation/Modification of Contract," and it specifically provided: "THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: FAR 52.243-4 Changes." Modification Form (ECF 1-5) at 1. FAR 52.243-4 is the Federal Acquisition Regulation that sets out the text of the required Government Changes clause, which permits the Government's Contracting Officer to "make changes in the work within the general scope of the contract." Terminations for Convenience clauses are set out in a different regulation. *See* FAR 52.249-2.

With regard to the Subcontract, Berkley points out that the Subcontract's plain language allows G-W to terminate the Subcontract for its convenience. To be sure, G-W possessed the *right* to terminate the Subcontract for its own convenience. *See* Subcontract ¶ 27. However, it is not clear from the record that G-W *exercised* that right. Berkley's Motion simply notes that the clause existed and then assumes that G-W invoked it. *See* Reply at 7–9. But, as discussed, the Subcontract contained multiple clauses that allowed G-W either to modify or to terminate the Subcontract. Without any evidence on the issue, it is impossible to determine the clause on which G-W relied when it communicated the change in scope to EWR.

In fact, the evidence in the record suggests that G-W intended to rely on the Owner Changes clause rather than on the Termination for Convenience clause. The record includes two documents sent from G-W to EWR that purport to adjust the amount due to EWR in light of the alteration in scope. Both are titled "*Change* Order" and refer to "Sequence *Changes*"; neither references the Termination for Convenience clause or uses the word "termination." *See* Change Order 11; Change Order 15 (emphasis added). Additionally, the Subcontract provided that a termination for convenience would only become effective upon EWR's receipt of a "notice of termination" from G-W, Subcontract ¶ 27, but no such notice appears in the record.

Viewing the evidence in the light most favorable to EWR, and drawing all reasonable inferences in EWR's favor, as I must do, *see Matsushita Elec. Indus. Co.*, 475 U.S. at 587, I cannot conclude that G-W terminated the Subcontract for convenience.[7]

Berkley has also failed to support its assertion that the payment EWR seeks would necessarily represent anticipated profits on unperformed portions of the project. According to Berkley, EWR had completed 10 phases of the Garage Renovation at the time of the purported termination. At that point, it had expended approximately $1.3 million in actual costs and had received approximately $2 million in payment from G-W. Thus, in Berkley's view, when the subcontract was terminated, EWR had been fully paid for its work on the first 10 phases of the

---

[7] Even if G-W invoked the Termination for Convenience clause, it is unclear what repercussions would ensue. The clause provides that upon termination, "[s]ettlement with the Subcontractor shall be accomplished in accordance with the provisions of the Termination for Convenience clause in the Prime Contract." Subcontract ¶ 27. But, the record does not contain a copy of the Prime Contract. Accordingly, it is unclear what the settlement provisions of the Prime Contract are or how they might affect EWR's recovery.

Garage Renovation, and it had made a sizable profit. And, because work had not yet begun on the remaining 15 phases of the Garage Renovation (*i.e.* EWR had no actual expenses related to the remaining 15 phases), any further recovery by EWR would necessarily represent anticipated profits on those 15 phases.

Berkley's argument assumes that because EWR has received more than it has spent, any further proceeds would represent profit on the cancelled portions of the Project. However, that is not necessarily the case. EWR stated in its Demand Letter that it had "already incurred costs for the Deleted Work, such as the purchase of materials . . . ." Demand Letter at 2. Thus, hypothetically speaking, it is conceivable that EWR spent only $1.2 million on the first 10 phases, received $1,993,974.38 for those 10 phases pursuant to the Subcontract and subsequent change orders, and also expended an additional $100,000 on materials in preparation for the remaining 15 phases. If this were the case, then recovery of that $100,000 would not represent lost profits, but rather actual expenses. The record does not include a detailed breakdown of EWR's costs, EWR's receipts, or the scope of change orders on the Project, and thus it does not contain sufficient information from which I can conclude that further payment to EWR would represent unrecoverable lost profits.

In sum, there are factual uncertainties at this stage that preclude the conclusion that EWR is not legally permitted to recover from Berkley. Accordingly, I will deny the Motion.[8]

## **CONCLUSION**

---

[8] Because I deny the Motion, I do not address EWR's arguments that the Motion was untimely and that the Motion "relies upon an inadmissible document."

For the foregoing reasons, defendants' Motion is denied. A separate Order, consistent with this Memorandum Opinion, follows.


Date: December 5, 2013                             /s/
                                            Ellen Lipton Hollander
                                            United States District Judge